UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN FURUKAWA, INC.,

Plaintiff,                                  Case No. 14-cv-13633

v.                                    UNITED STATES DISTRICT COURT JUDGE
                                              GERSHWIN A. DRAIN

ISTHIHAR HOSSAIN,
HT WIRE & CABLE AMERICAS, LLC            UNITED STATES MAGISTRATE JUDGE
                                            STEPHANIE DAWKINS DAVIS

Defendants.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
[119] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [117]**

## I. INTRODUCTION

On September 19, 2014, American Furukawa, Inc. ("Furukawa" or "Plaintiff"), filed the instant action against former employee, Isthihar Hossain ("Defendant Hossain" or "Hossain"). *See* Dkt. No. 1. In the Complaint, Furukawa alleges eight Counts: (I) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; (II) Fraud; (III) Breach of Contract; (IV) Breach of Fiduciary Duty; (V) Misappropriation of Trade Secrets under MICH. COMP. LAWS § 445.1902; (VI) Conversion; (VII) Tortious Interference; and (VIII) Civil Conspiracy. *Id.*

-1-

On September 16, 2015, Furukawa amended the Complaint to add another Defendant, HT Wire & Cable America, LLC ("HT Wire"). *See* Dkt. No. 65. On October 5, 2015, the Hossain and HT Wire (collectively, "Defendants") moved to dismiss the action and defer to arbitration. *See* Dkt. No. 79. That Motion was denied on November 19, 2015. *See* Dkt. No. 97.

Presently before the Court are Plaintiff's and Defendants' Motions for Summary Judgment. *See* Dkt. No. 117 & 119. Both Motions have been fully briefed. A hearing was held on June 13, 2016 at 2:30 p.m. For the reasons discussed below, the Defendants' Motion [117] is **GRANTED IN PART**, and Plaintiff's Motion [119] is **DENIED**.

## II. BACKGROUND

Furukawa is a supplier of advanced automotive technology, electronics and specialty products to several high technology industries. Isthihar Hossain accepted employment with Furukawa in September, 2011 as a Power Systems Electrical Engineer.

When Hossain began his employment with Furukawa, Furukawa asserts that Hossain agreed to abide by several of Furukawa's Policies, including Furukawa's policy on "Removable Media Use." Furukawa also asserts that Hossain entered into an Invention Assignment & Secrecy Agreement ("Secrecy Agreement") with Furukawa, which dictated that Hossain "will regard and preserve as confidential all

trade secrets pertaining to the Company's business that have been or may be obtained by me by reason of my employment." The Secrecy Agreement also dictated that Hossain would not "without prior authority from the company to do so, use for [his] own benefit or purposes, nor disclose to others, either during [his] employment or thereafter" any trade secrets pertaining to Furukawa's business.

By 2014, Hossain had become a Senior Production Manager with access to Furukawa's know-how, intellectual property and other confidential information. On March 11, 2014, while he was still employed by Furukawa, Furukawa asserts that Hossain entered into an "Employment Agreement" with Heibei Huatong Wires & Cables Group Co., Ltd. ("Huatong")—a competitor and supplier to Furukawa.

On March 17, 2014, Hossain informed Furukawa he was unable to work due to a basketball injury. Notably, pursuant to his alleged Agreement with Huatong, Hossain was scheduled to begin his employment with Huatong on March 17, 2014. As a result of his reported injury, Hossain was granted a leave of absence, commencing March 18, 2014. As a condition for granting leave, Furukawa asserts that it instructed Hossain that he could not do any work for Furukawa while he was away. Despite the instructions to the contrary, Furukawa asserts that Hossain accessed information on his company laptop, copied Furukawa files, and sent them

from his company email to his personal "gmail" account during his leave of absence.

On March 20, 2014, Huatong announced that it would no longer sell Electrical Submersible Pump ("ESP") cables and photovoltaic ("PV") cables (collectively, the "Cables") to the United States market, through Furukawa.

On April 24, 2014, Hossain sent an email to Furukawa's Manager of Human Resources stating that his doctor had cleared him to return to work. On Monday, April 28, 2014, Hossain announced that he was resigning his employment, effective May 2, 2014. Furukawa accepted Hossain's resignation, effective April 29, 2014, and paid him through May 2, 2014.

Despite his alleged Agreement with Huatong, when he resigned his employment, Hossain allegedly indicated he did not "have another job lined up or anything," but his "previous employer" had been contacting him, and he was "pretty sure" that he could get a job with them. Upon his departure from Furukawa, Hossain was asked to sign an "Employee Certification & Agreement on Termination," certifying that he had returned all property belonging to the Company, had complied with the Secrecy Agreement and would continue to abide by that Agreement. Hossain allegedly refused to sign.

On or about May 12, 2014, Furukawa learned that Huatong had approached WTEC—one of Furukawa's customers—about buying cable from Huatong. On

May 16, 2014, Furukawa received an email from WTEC regarding WTEC's "compound" requirements and "payment terms." The email from WTEC was addressed to Hossain at his former Furukawa email address.  On May 30, 2014, WTEC confirmed that Hossain was acting as Huatong's agent with respect to the sales negotiations between WTEC and Huatong. On June 5, 2014, Furukawa received another email from WTEC, addressed to Hossain's Furukawa email address, purportedly asking Hossain to quote the price for several sets of cables.

Furukawa sent a letter to Hossain on June 9, 2014, reminding him of his obligations under the Secrecy Agreement. In the letter, Furukawa demanded that Hossain immediately cease and desist from any further solicitation of cable business from WTEC or any other customer of Furukawa. Furukawa also sought assurances that Hossain would abide by his trade secret obligations, and would not use or disclose any trade secret information that he acquired during his employment with Furukawa. Hossain purportedly refused to comply with this request. Furukawa attempted to negotiate with Hossain to resolve the dispute. Throughout the negotiations, Hossain purportedly maintained that he had returned all property belonging to Furukawa and fully complied with the Secrecy Agreement. After looking into the actions of Hossain, Furukawa brought the instant action pursuant to the CFAA and Michigan law.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. DISCUSSION

### A. Defendants' Motion for Summary Judgment

Defendants attack on Plaintiff's claims is essentially three-fold. Defendants first attack Plaintiff's claim under the Michigan Uniform Trade Secrets Act ("MUTSA"), arguing that the information downloaded by Hossain did not contain any trade secrets. Defendants next attack Plaintiff's claim overall, arguing that

Plaintiff has not made a proper request for damages. Finally, Defendants argue that Plaintiff's state-law tort claims are pre-empted by MUTSA.

a. *Plaintiff's MUTSA Claim*

Defendants first move for summary judgment on Plaintiff's claim under the MUTSA. Defendants argue that Plaintiff has failed to establish that the alleged data breach involved trade secrets as defined by the statute.

In order to establish a violation of MUTSA, the plaintiff must show that (1) it has protectable trade secrets, and (2) defendant has improperly acquired, disclosed or used those trade secrets. *Compuware Corp. v. International Business Machines Corp.*, No. 02–70906, 2003 WL 23212863, *6 (E.D. Mich. December 19, 2003); MICH. COMP. LAWS § 445.1902. The statute defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, or process," that (1) "[d]erives independent economic value, actual or potential, from not being generally known" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." MICH. COMP. LAWS § 445.1902(d); *Delphi Automotive PLC v. Absmeier*, No. 15-cv-13966, 2016 WL 787137, *10 (E.D. Mich. March 1, 2016). "Information may be 'generally known' if it has been disclosed to, is known to, or is ascertainable by persons in the relevant industry of field." *Compuware*, 2003 WL 23212863 at *6. "A party

alleging trade secret misappropriation must particularize and identify the purportedly misappropriated trade secrets with specificity." *Id.*

Defendants argue that the product information alleged to have been misappropriated was in fact "within the knowledge and control of" Huatong— parent company to Defendant HT Wire—before Defendant Hossain ever downloaded any files. Dkt. No. 117 at 15–18 (Pg. ID No. 2315–18). According to Defendants, Huatong gained access to this information via the creation of a Joint Venture Agreement with Plaintiff's parent company. Dkt. No. 117 at 25 (Pg. ID No. 2325). Therefore, Defendants argue, the information was generally known, and thus cannot be considered trade secrets. The argument is flawed on two levels.

First, this line of argument has already been rejected by the Supreme Court of Michigan. *Hayes-Albion v. Kuberski*, 421 Mich. 170, 185 (1984) ("First, information may qualify as a trade secret although others possess it."). Therefore, without more, Defendants' argument is insufficient to rule that the allegedly misappropriated files were not trade secrets. *Id.* at 181–182.

Second, as Plaintiff notes, Defendants have not identified, nor evidenced, what information was possessed by Huatong, and if it indeed encompasses all of the alleged trade secrets that have been purportedly stolen. Defendants' argument implies that the only trade secrets at issue relate to the technology or manufacturing of specific products. Dkt. No. 117 at 18 (Pg. ID No. 2318) ("Here,

Defendant's parent company either developed the products at issue (ESP Cables, PV Cables, and Low Voltage Cables) or jointly developed them, and through shared technology (MV URD Cables)."). Their argument discounts the fact that "customer and supplier contact information, customer requirements, pricing information, factory costs and factory capacity"—which may also be trade secrets—are also alleged to have been misappropriated. Dkt. No. 125 at 10 (Pg. ID No. 3158); *Giasson Aerospace Science, Inc. v. RCO Engineering, Inc.*, 680 F. Supp. 2d 830, 844 (E.D. Mich. 2010) (finding that a jury could conclude that "vendor product and pricing information" constituted a trade secret.). Therefore, there is a dispute of fact as to whether all of the information was even possessed by Defendants. Accordingly, Plaintiff's MUTSA claim survives the Motion.

### b. *Plaintiff's Claim for Damages*

Defendants argue that Plaintiff cannot claim damages for materials it has never manufactured, and further, that Plaintiff cannot articulate the method by which he calculated damages, and thus they are too vague. These arguments however are without merit.

### i. Damages for Items Yet to be Manufactured

Plaintiff has alleged damages for: (1) sales and marketing expenses incurred, but not recovered due to the loss of business; (2) lost sales; (3) value of the information that was misappropriated; and (4) out-of-pocket expenses, including

lost time and professional fees. Dkt. No. 125 at 11 (Pg. ID No. 3159). Defendants' Motion, although cryptic, appears to argue that the first two categories, loss of business and lost sales, cannot be granted because Plaintiff in fact did not have any sales to begin with, nor the capacity to generate sales. Dkt. No. 117 at 19 (Pg. ID No. 2319).

As an initial matter, the latter two categories of damages are not only appropriate, but they are also unchallenged by the Defendant. *See e.g.,* MICH. COMP. LAWS § 445.1904 ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."). Accordingly, the Motion for Summary Judgment cannot be granted on this argument alone. The question then becomes whether or not Plaintiff's claim for damages should be limited on this basis. In other words, may Plaintiff recover for the lost profits of an item it did not have immediate plans to produce?

"Courts have used a wide variety of methods to measure damages in trade secret cases, including lost profits, unjust enrichment and reasonable royalty." *Pioneer Hi-Bred Intern. v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1243 (8th Cir. 1994). "In order to recover prospective profits, a plaintiff must establish proof of lost profits with a reasonable degree of certainty." *Joerger v. Gordon Food Service, Inc.*, 224 Mich. App. 167, 175 (1997).

-10-

There have been very few, if any, cases involving Michigan trade secret law regarding the availability of lost profits as a remedy when the plaintiff has failed to establish that it sold certain items. However, other courts have granted summary judgment to defendants (and have chosen an alternate means to measure damages) when plaintiffs have failed to dispute similar allegations, particularly in patent cases. *See Kowalski v. Mommy Gina Tuna Resources*, 574 F. Supp. 2d 1160, 1163 (D. Hawai'i 2008); *see also Herbert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996) ("When the patentee does not seek to make and sell the invention, lost profits are not an appropriate measure of damages."); *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443 (Fed. Cir. 1990) (holding that lost profits were unavailable where the patentee did not himself manufacture and sell the device).

Here, Plaintiff has neither sold, nor has immediate plans to sell ESP cables. Dkt. No. 117 (Exhibit D, pp. 46–49). However, contrary to Defendants' assertions, Plaintiff has sold the other materials at issue—PV cables, low voltage cables, and MV URD cables. *See e.g., id.* (Exhibit C, p. 47). Because Plaintiff has engaged in the sale of these other products, lost sales/lost profits will not be foreclosed as a measure of damages.

### ii.  Lack of Methodology for Damages

Next, Defendants argue that Plaintiff has failed to provide a methodology for its measure of damages. In support, Defendants primarily point to the deposition of

Plaintiff's witness, Shuichi Takagi. Dkt. No. 117 at 21 (Pg. ID No. 2321). Defendants argue that Takagi was "solely responsible creating [*sic*] the calculations and determining the value of the allegedly misappropriated items." *Id.*

Defendants' entire argument appears to assume that Takagi is acting as Plaintiff's damages expert, and is required to provide Defendants with Plaintiff's damage model. This assumption is misguided.

Plaintiff intends to present their damages model in the form of expert testimony from a separate witness. Dkt. No. 125 at 12 (Pg. ID No. 3160). But at a more fundamental level, Defendants' objection stems from Takagi's inability to recall specific details in his estimates on command. Dkt. No. 117 at 21 (Pg. ID No. 2321); *id.* (Exhibit G, pp. 180–90). Critically, at the deposition, Takagi was unable to consult his materials when asked questions regarding the reasoning behind his valuations. *Id.* For this reason, Defendants argue that Takagi's estimates amount to nothing more than "speculation."

Defendants do not provide any authority supporting the position that a non-expert witness be required to recite, from memory, every detail of a damages estimate. As Plaintiff points out, this objection merely goes to the weight of Takagi's lay-witness valuation of the claims. Dkt. No. 125 at 13 (Pg. ID No. 3161). Moreover, the witness himself states in his deposition that his valuations are based on his prior experiences evaluating intellectual property. Dkt. No. 125 (Exhibit 8,

p. 64). Therefore, they are not based on "speculation" or "conjecture." Accordingly, Defendants are not entitled to summary judgment on this theory either.

### c. Tort Claims

Defendants next argue that Plaintiff's tort claims are displaced by its MUTSA claim. Dkt. No. 117 at 26 (Pg. ID No. 2326). Under Michigan Law, a claim under MUTSA preempts tort claims when the allegations center *exclusively* on the defendant's misappropriation and unauthorized use of trade secrets. *See Dura Global Technologies, Inc. v. Magna Donnelly Corp.*, No. 07–10945, 2009 WL 3032594, *3 (E.D. Mich. Sept. 18, 2009) (quoting *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943 (W.D. Mich. 2003)). "However, MUTSA does not displace . . . '[o]ther civil remedies that are not based on misappropriation of a trade secret.' " *Bliss Clearing Niagara, Inc.*, 270 F. Supp. 2d at 946.

Defendants raised this issue in their Motion for Judgment on the Pleadings. *See* Dkt. No. 30. In its May 6, 2015 Opinion and Order, this Court held that Plaintiff "[alleged] facts, independent of the MUTSA claim, supporting causes of action for Fraud, Breach of Fiduciary Duty, and Conversion." *American Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d 864, 884 (E.D. Mich. 2015). Here, in response to Defendants' present Motion, Plaintiff points solely to the Court's prior

Opinion. However, that Opinion was issued at the pleadings stage when all allegations in the Complaint were taken as true. At the summary judgment stage, Furukawa must point to evidence in the record supporting its claims. Furthermore, even though there are issues of fact regarding whether the downloaded information actually contained trade secrets, prior case law indicates that "the disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by the MUTSA." *Bliss Clearing Niagara, Inc.*, 270 F. Supp. 2d at 948–949; *see also Easton Sports, Inc. v. Warrior LaCross, Inc.*, No. 05–cv–72031, 2005 WL 2234559, *1–3 (E.D. Mich. September 14, 2005).

MUTSA displaces all common law claims that "are arguably cognizable under" MUTSA. *Bliss Clearing Niagara, Inc.*, 250 F. Supp. 2d at 948. Therefore, the Court shall look to the record as submitted by both parties to determine whether there is evidence of wrongful conduct "*independent* of the misappropriation of trade secrets" that would amount to causes of action for Furukawa's tort claims. *Id.* at 950 (emphasis added).

i. Fraud

Furukawa's fraud claim rests not on Hossain's misappropriation of information, but instead on several representations and omissions made by Hossain. *See* Dkt. No. 119 at 12–17 (Pg. ID No. 2581–86). For example, Furukawa alleges Hossain fraudulently represented that he suffered a basketball injury and

needed time off on March 17, 2014. *Id.* at 12 (Pg. ID No. 2581). Furukawa also alleges that Hossain's non-disclosure of his dual employment constitutes fraud. This conduct is separate and removed from the misappropriation of confidential information. Therefore, this claim will not be displaced.

ii.  Breach of Fiduciary Duty

Under Michigan law, "if an agent acquires any pecuniary advantage to himself from third parties by means of his fiduciary character, he is accountable to his employer for the profit made." *Central Cartage Co. v. Fewless*, 591 N.W.2d 422, 426 (Mich. App. Ct. 1998). In order to survive MUTSA displacement, a plaintiff must show that the breach of fiduciary duty claims rest on "wrongful acts" other than the misappropriation of trade secrets. *Easton Sports*, 2005 WL 2234559 at *3.

Plaintiff's breach of fiduciary duty claim is based not only on the "using and disclosing of confidential information," but also on "entering into an Employment Agreement with Huatong while still employed by Furukawa," and actively "diverting business away from Furukawa." *See* Dkt. No. 65 at 23 (Pg. ID No. 1167).

Hossain does not dispute that he signed an employment agreement with Huatong while still under the employ of Furukawa. Moreover, Furukawa has brought testimonial evidence that Hossain himself "[pursued] business with

American Furukawa customers, both current customers as well as customers that he helped to get business with." Dkt. No. 119 (Exhibit 19, p. 113). Even without the alleged misappropriation of confidential information, a reasonable juror could find that these facts constitute a breach of Hossain's duty of loyalty. Therefore, this is conduct that is independent of Plaintiff's alleged trade secret claims. Accordingly, this claim will not be displaced.

### iii.  Tortious Interference

Similar to breach of fiduciary duty, in order to survive MUTSA preemption, a plaintiff must evidence "wrongful acts" other than the misappropriation of trade secrets. *Easton Sports*, 2005 WL 2234559 at *2. As stated above, Furukawa has evidenced that Hossain committed a wrongful act by directly interfering with Furukawa's current customers. Accordingly, this claim will not be preempted.

### iv.  Civil Conspiracy

Furukawa's civil conspiracy claim is also premised on conduct other than the misappropriation of trade secrets, including making misrepresentations, and directly interfering with Furukawa's business relationships. Accordingly, this claim will not be preempted.

### v.  Conversion

Plaintiff's conversion claim rests solely on Hossain taking possession of "various computer files and confidential information." Dkt. No. 65 at 27 (Pg. ID

No. 1172). In this Court's prior Opinion and Order Denying Defendant's Motion for Judgment on the Pleadings, the Court emphasized that it was alleged that other confidential information *in addition* to the trade secrets had been misappropriated, thus allowing the conversion claim to move forward. *American Furukawa, Inc.*, 103 F. Supp. 3d at 885 n.11. Had Furukawa evidenced the taking of a non-trade secret, this conversion claim could move forward. However, Furukawa has failed to point to any copied information that is *not* arguably a trade secret. In fact, at oral argument, counsel for Furukawa argued that *all* of the information taken by Hossain may constitute a trade secret. This claim therefore rests solely on the misappropriation of potential trade secrets and is pre-empted by MUTSA. *Easton Sports*, 2005 WL 2234559 at *2.

## B. Plaintiff's Motion for Summary Judgment

Furukawa has moved for summary judgment on all of its asserted claims. The Court shall analyze each claim in turn.

### a. Computer Fraud and Abuse

The Amended Complaint alleges violations of 18 U.S.C. §§ 1030(a)(2) and (a)(4), of the CFAA. To prevail on a claim under § 1030(a)(2), Furukawa must prove that Hossain: (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that he (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate

or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value. *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).

To successfully bring an action for a violation of § 1030(a)(4), Furukawa must show that Hossain: (1) accessed a protected computer, (2) without authorization or exceeding such authorization that was granted, (3) knowingly and with intent to defraud, and thereby (4) "further[ed] the intended fraud and obtain[ed] anything of value," causing (5) a loss to one or more persons during any one-year period aggregating at least $5,000 in value. *See id.* (citing *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d. Cir. 2005)). Defendants contest both claims, arguing that "Plaintiff has not established any damage or loss as defined by the [CFAA]." Dkt. No. 124 at 25 (Pg. ID No. 2884).

Defendants argue that "copying information without more does not state a cognizable claim for 'damage' under the CFAA, even in situations where a former employee is accused of taking information from his former employer and giving it to a 'competitor.' " Dkt. No. 124 at 26–27 (Pg. ID No. 2885–86). Furukawa argues that it did not suffer "damage," but instead suffered a "loss" because Furukawa had to take remedial measures (in the form of a computer forensic investigation, and

-18-

attorney fees) in response to Hossain's copying. Dkt. No. 131 at 7–8 (Pg. ID No. 3355–56).

First, under the CFAA, "[a]ny person who suffers damage *or* loss by reason of a violation" may maintain a civil action. 18 U.S.C. § 1030(g) (emphasis added). The CFAA defines a "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). This is separate from the term "damage," which the Act defines as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(d)(8). Therefore, Furukawa's claim may survive although it appears they do not claim to have suffered any "damage" as defined under the Act.

"Courts have consistently interpreted 'loss' . . . to mean a cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted." *Lasco Foods, Inc. v. Hall and Shaw Sales, Marketing & Consulting, LLC*, 600 F. Supp. 2d 1045, 1052 (E.D. Mo. 2009) (quoting *Frees, Inc. v. McMillian*, No. 05–1979, 2007 WL 2264457, *3 (W.D. La. Aug. 6, 2007)). While some courts find that any response to an offense qualifies as a loss, *Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 651 (E.D. Va.

-19-

2010), other courts require that any "loss" stem from an "interruption of service." *Lasco Foods Inc.*, 686 F. Supp. 2d at 1052.

The Sixth Circuit has found that investigations into an offense and the conduction of a damage assessment constitute a "loss" as defined by the CFAA; interruption of service is not necessary. *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1074 (6th Cir. 2014) ("Thus . . . it was not necessary that Plaintiffs establish that an 'interruption in service' occurred."); *Dice Corp. v. Bold Technologies*, No. 11–13578, 2012 WL 263031, *2 (E.D. Mich. January 30, 2012). In this case, upon learning that there was a data breach, Furukawa took remedial action to investigate the matter. However, Furukawa has not provided the Court with the documents detailing its expenses. Therefore, as of now, there is no way to determine whether the response to the offense resulted in over $5,000 in expenses. Accordingly, Furukawa has failed to prove a necessary element of their claim, and thus summary judgment cannot be granted.

### b. Furukawa's Fraud Claim

"As a general rule, actionable fraud consists of the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act

-20-

upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 27 (1998). In the current action, Furukawa alleges that Hossain made actionable misrepresentations, and also actionable non-disclosures.

      i.  Fraudulent Misrepresentations

Furukawa's Motion points to three representations made by Hossain. First, Furukawa alleges that Hossain "misrepresented his relationship with Huatong, and his activities on behalf of Huatong." Dkt. No. 119 at 24 (Pg. ID No. 2593). This "misrepresentation" allegedly occurred when, on March 17, 2014, Hossain told Furukawa that he was unable to work due to a basketball injury. *Id.* at 12 (Pg. ID No. 2581). Next, Furukawa alleges that Hossain misrepresented his relationship to Huatong again when he resigned. *Id.* at 24 (Pg. ID No. 2593). This apparently occurred twice. Once, in late April or early May of 2014, when Hossain, upon resigning, informed Furukawa that "he did not 'have another job lined up or anything . . . . ' " *Id.* at 14 (Pg. ID No. 2583). Then a second time, in June 2014, when Hossain allegedly told Furukawa that "he had returned all property belonging to [Furukawa], and had fully complied with his Secrecy Agreement." *Id.* at 17 (Pg. ID No. 2586).

Hossain does not dispute that he told Furukawa that he suffered a basketball injury and needed time off on March 17, 2014. *Id.* (Exhibit 18, p. 56). However,

Hossain testifies that he did indeed need time off because he needed surgery on his Achilles tendon. *Id.*; *see* Dkt. No. 124 (Exhibit A, ¶ 7). Therefore, there is a dispute of fact as to the falsity of this statement.

Furthermore, Furukawa has failed to demonstrate how it relied on Hossain's next two statements. Furukawa claims that it relied on Hossain's representations by "continuing his employment, continuing his salary and benefits, allowing him to have access to confidential information and allowing him to have access to customers." *Id.* at 24–25 (Pg. ID No. 2593–94). However, the latter two statements were only made upon or after Hossain's resignation. Therefore, it's not clear how Hossain's employment, benefits, or access to confidential information would have been continued, as he was no longer an employee in Furukawa.

ii.  Silent Fraud

Furukawa also argues that Hossain's failure to disclose his relationship to Huatong at the time he signed the Employment Agreement constituted fraud. Dkt. No. 131 at 11 (Pg. ID No. 3359). However, this argument was raised in the Plaintiff's reply brief, and was not included in the Plaintiff's original Motion for Summary Judgment. Therefore, this argument will not be considered on summary judgment as Defendants have not had appropriate notice to respond. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

Moreover, even if the Court were to consider this argument, Furukawa's claim still fails. The doctrine of "silent fraud" has long been recognized in Michigan. *See Tompkins v. Hollister*, 60 Mich. 470 (1886). However, in order for a silent fraud action to exist, the plaintiff must prove that the defendant breached a legal or equitable duty of disclose. *U.S. Fidelity and Guaranty Co. v. Black*, 412 Mich. 99, 125 (1981); *Williston v. Garrow-Loftis Realtors*, No. 257647, 2006 WL 335830, *1 (Mich. Ct. App. February 14, 2006) ("A claim of silent fraud requires circumstances that establish a legal duty to make disclosure; mere nondisclosure of information is insufficient."). Furukawa presents no authority for the position that such a duty to disclose existed in the present case.

### c. Breach of Contract

To prevail on a claim for breach of contract, the plaintiff must establish (1) the existence of a contract and its terms, (2) performance by the plaintiff, (3) breach of the contract by defendant, and (4) damages. *Green Leaf Nursery, Inc. v. Kmart Corp.*, 485 F. Supp. 2d 815, 818 (E.D. Mich. 2007).

Furukawa alleges that Hossain breached Furukawa's Secrecy Agreement by "using and disclosing confidential information," "taking such information with him when he [resigned]," and using it for his own purposes. Dkt. No. 119 at 26 (Pg. ID No. 2595). Furukawa also alleges that Hossain violated Furukawa's policies

-23-

concerning "Conflicts of Interest," and "Outside Employment" and "Removable Media Use." *Id.*

This Court has already held that "Furukawa's Breach of Contract claim is *only* premised on the 'Invention Assignment & Secrecy Agreement . . . and impliedly, Furukawa's Removable Media Policy." *American Furukawa, Inc.*, 103 F. Supp. 3d at 885. Therefore, the Court's analysis of this claim will be limited to these two documents.

i.   The Secrecy Agreement

There is no dispute that the Secrecy Agreement is a valid and enforceable contract. Defendants argue that the Secrecy Agreement is not applicable to non-trade secrets, and Plaintiff's failure to prove the existence of trade-secrets precludes summary judgment. Dkt. No. 124 at 28 (Pg. ID No. 2887).

The relevant provision of the Secrecy Agreement reads:

> I will regard and preserve as confidential all trade secrets pertaining to the Company's business that have been or may be obtained by me by reason of my employment. I will not without prior written authority from the Company to do so, use for my own benefit or purposes, nor disclose to others, either during my employment or thereafter, except as required in the course of my employment with the Company and I will not take, retain or copy any of the Company's specifications, drawings, blueprints, reproductions, or other documents or items. This provision shall not apply after the Company information has been voluntarily disclosed by others, or otherwise enters the public domain through lawful means.

-24-

Dkt. No. 119 (Exhibit 6, ¶ 6). Furthermore, the term "trade secrets" is defined in the Secrecy Agreement as including, but not limited to:

> all Company information encompassed in all drawings, designs, plans, proposals, marketing & sales plans, financial information, costs, pricing information, and all concepts or ideas in or reasonably related to the business of the Company that have not previously been publicly released by duly authorized representatives of the Company.

*Id.*(Exhibit 6, ¶ 1). Therefore, the definition of "trade secrets" in the Secrecy Agreement is broader than the term's definition under Michigan law. In the contract, the term "trade secret" is merely a proxy for all company information "reasonably related to the business of" Furukawa that has not been previously released to the public. *Id.* The Court is bound to enforce the Agreement's unambiguous language. *Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375 (2003).

There is no dispute that Hossain downloaded many of Furukawa's files onto his personal laptop. The act of copying or downloading the files is in violation of the Secrecy Agreement's prohibition of retaining or copying company items. *See* Dkt. No. 119 (Exhibit 6, ¶ 6). However, Plaintiff has not proven that it was damaged by this violation. Accordingly, the Court will deny Plaintiff summary judgment.

ii.  The Removable Media Use Policy

The parties dispute whether or not the Removable Media Use Policy can be enforced as a contract at law. "Not all policy statements will constitute a 'promise . . . .' " *Lytle v. Malady*, 458 Mich. 153, 165 (1998). "[A] 'policy' is commonly understood to be a flexible framework for operational guidance, not a perpetually binding contractual obligation." *Id.* at 165 n.11. However, under Michigan law, "where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced." *Toussaint v. Blue Cross & Blue Shield of Michigan*, 208 Mich. 579, 613 (1980). "The employer has then created a situation 'instinct with an obligation.' " *Id.* And accordingly, "employer statements of policy . . . can give rise to contractual rights." *Id.* at 614. However, despite the apparent enforceability of the policy at contract, summary judgment is still not warranted.

A plain reading of the policy indicates that employees, authorized to use removable media devices such as flash drives or memory sticks, must first gain approval from their manager, upper management and the IT department before they are allowed to use said devices. Dkt. No. 119 (Exhibit 3). Hossain's deposition testimony indicates that there is uncertainty over whether he in fact attached a portable device to his laptop. *Id.* (Exhibit 18, p. 98). Accordingly, there

is a dispute of fact over whether the policy was breached, and Plaintiff is not entitled to Summary Judgment.

### d. Breach of Fiduciary Duty

"Under principles of agency, an agent owes his principal a duty of good faith, loyalty, and fair dealing." *H.J. Tucker & Assoc., Inc. v. Allied Chucker & Eng'g Co.*, 234 Mich. App. 550, 595 (1999). These duties prevent an agent from acting for himself at the principal's expense. *Nedschroef Detroit Corp. v. Bemas Enterprises LLC*, 106 F. Supp. 3d 874, 882 (E.D. Mich. 2015) (citing *Central Cartage Co.*, 591 N.W.2d at 426). As stated above, under Michigan law, "if an agent acquires any pecuniary advantage to himself from third parties by means of his fiduciary character, he is accountable to his employer for the profit made." *Central Cartage Co.*, 591 N.W.2d at 426.

Furukawa argues that Hossain is liable on this count because he entered into an employment agreement with Huatong while still working for Furukawa, and diverted business away from Furukawa. Dkt. No. 119 at 28 (Pg. ID No. 2597). However, Hossain's testimony disputes that he ever interfered with any Furukawa customers. *Id.* (Exhibit 18, p. 59). Moreover, according to Hossain, he was merely making plans to leave Furukawa when he signed his Employment Agreement. *Id.* Merely entering an employment agreement with another company is not enough by itself to constitute a breach of a fiduciary duty. *Meyers v. Roger J. Sullivan Co.*,

166 Mich. 193, 196 (1911); *see also In re Sullivan*, 305 B.R. 809, 819 (Bankr. W.D. Mich. 2004). Accordingly, Plaintiff is not entitled to summary judgment on this claim.

> *e. MUTSA*

To prevail under MUTSA, the plaintiff must prove (1) it has protectable trade secrets, and (2) the defendant has improperly acquired, disclosed or used those trade secrets. *Compuware Corp.*, 2003 WL 23212863 at *6; MICH. COMP. LAWS § 445.1902.   As described above, a trade secret is defined as any "information, including a formula, pattern, compilation, program, device, method, or process," that (1) "[d]erives independent economic value, actual or potential, from not being generally known" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." MICH. COMP. LAWS § 445.1902(d).

Defendants argue that Furukawa has failed to specifically identify their trade secrets, and provide evidence that the content of the allegedly misappropriated documents derive any economic value from not being generally known. Dkt. No. 124 at 18 (Pg. ID No. 2877). The Court agrees.

Michigan courts have held that an alleged trade secret must be identified "clearly, unambiguously, and with specificity." *Utilase, Inc. v. Williamson*, No. 98–1233, 98–1320, 1999 WL 717969, *6 (6th Cir. September 10, 1999). The

identification of alleged trade secrets is important because "the general knowledge of an employee does not constitute a trade secret," *Lowry Holding Co., Inc. v. Geroco Tech Holding Corp.*, No. 303694, 2012 WL 1890231, *3 (Mich. Ct. App. 2012), and the concept of misappropriation of trade secrets "must not compromise the right of employees to change jobs." *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 535 (6th Cir. 2008). Accordingly, a plaintiff claiming misappropriation of trade secrets must "particularize and identify the material that it claims qualifies for trade secret protection" and "establish the independent economic value of the material." *PrimePay, LLC v. Barnes*, No. 14–11838, 2015 WL 2405702, *24 (E.D. Mich. May 20, 2015).

In *PrimePay*, the court found that a plaintiff's MUTSA claim was unlikely to succeed on the merits, in part because the plaintiff did not describe in detail why their purported trade secrets were valuable. In that case, financial information was allegedly misappropriated from a payroll services company. A witness for the plaintiff testified that the information would be of "significant competitive value" because it provided a blueprint to competitors. The *PrimePay* court found this unpersuasive. The court reasoned that the "evidence still [fell] short of explaining with any degree of clarity how this information, given this particular industry, has competitive value from not being generally known to every other payroll services

-29-

company or how this type of information could be used by a competitor to steal customers." *Id.*

Here, Furukawa has offered very little evidence demonstrating with any degree of clarity how the information at issue has competitive value in the advanced technology and electronics industry. Furukawa argues that the copied information derives economic value by virtue of the fact that Hossain copied them, and the information would give him a "competitive advantage." Dkt. No. 131 at 4–7 (Pg. ID No. 3352–55). This argument—it is valuable because he took it—is circular. Furukawa has not explained the nature of the information's value, nor how it would give a third party a competitive advantage. Using the analysis described in *PrimePay*, the Court finds that Plaintiff is not entitled to summary judgment on this claim.

### f. Conversion

As explained above, Plaintiff's Conversion claim has been displaced by Plaintiff's MUTSA claim. Accordingly, Plaintiff is not entitled to summary judgment on its conversion claim.

### g. Tortious Interference

To prevail on a claim for tortious interference with a business expectancy, the plaintiff must establish: (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract; (2)

-30-

knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the plaintiff whose relationship or expectancy was disrupted. *Health Call of Detroit v. Atrium Home & Health Care Services, Inc.*, 268 Mich. App. 83, 90 (2005).

As stated above, whether Hossain actually interfered with any of Furukawa's customers (directly or indirectly) is in dispute. Accordingly, summary judgment will not be granted on this claim.

### h.  Civil Conspiracy

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 313 (1992). Plaintiff has brought no evidence that either Huatong or HT Wire engaged in any unlawful conspiracy. Accordingly, Furukawa's motion on this claim is denied.

## V. CONCLUSION

For the reasons discussed above,

**IT IS HEREBY ORDERED**, that Defendants' Motion [117] is **GRANTED IN PART** with respect to Plaintiff's Conversion Claim (Count VI).

-31-

**IT IS FURTHER ORDERED** that the Defendants' Motion [117] is **DENIED IN PART** with respect to Counts I, II, III, IV, V, VII, and VIII.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [119] is **DENIED** on all Counts.

**IT IS SO ORDERED.**

Dated:  June 23, 2016                    s/Gershwin A. Drain_____
      Detroit, Michigan                    GERSHWIN A. DRAIN
                                      United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on **<u>June 23, 2016.</u>**

                                  s/Tanya R. Bankston_____
                                  TANYA R.BANKSTON
                                  Case Manager & Deputy Clerk