UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN FURUKAWA, INC.,                    Case No. 14-13633

            Plaintiff,                    Stephanie Dawkins Davis
v.                                          United States Magistrate Judge

ISTHIHAR HOSSAIN and
HT WIRE & CABLE AMERICAS, LLC,

            Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.    INTRODUCTION

American Furukawa, Inc., a distributor of automotive and electrical

components, including power cables and wires, filed this suit against defendant

Isthihar Hossain, a former employee, alleging violation of the Computer Fraud and

Abuse Act – 18 U.S.C. § 1030, fraud, breach of contract, breach of fiduciary duty,

misappropriation of trade secrets, conversion, tortious interference with a business

relationship and expectancies and civil conspiracy. (Dkt. 65). With the exception

of fraud, breach of contract and breach of fiduciary duty, plaintiff asserts the same

claims against defendant HT Wire & Cable Americas, LLC (HT), the American

affiliate of defendant Hossain's new employer, Hebei Huatong Electric and Cable

Group, Ltd. ("Huatong"). (Dkt. 65).

1

## II.    PROCEDURAL HISTORY

Plaintiff, American Furukawa, Inc.  (Furukawa) filed its complaint on September 19, 2014.  (Dkt. 1).  At the inception of this action, plaintiff obtained a temporary restraining order (TRO) requiring Hossain to refrain from using, accessing, altering, destroying, disclosing, copying, duplicating, transferring, divulging or otherwise disseminating any of plaintiff's information that had been electronically stored on any device or account controlled by defendant, and to return all of any such information to the plaintiff.  (Dkt. 4, 7).  By way of stipulated order on October 16, 2014, the parties agreed to extend the terms of the TRO until further order of the court, and established terms for a forensic examination of defendant's devices and accounts by plaintiff's expert.  (Dkt. 18).

The Court granted Furukawa leave to amend its complaint to add defendant HT Wire, the American affiliate of Huatong that was formed by Huatong (a Chinese corporation doing business in the United States) and defendant Hossain, and to add claims for tortious interference with business relationships and civil conspiracy.  (Dkt. 65).  The court denied the defendants' motion to dismiss for arbitration, finding that the defendants had waived any right to arbitration that may have existed.  (Dkt. 97).  On the parties' cross motions for summary judgment, the court denied plaintiff's motion, finding questions of fact remained as to plaintiff's claims.  The court denied in part and granted in part the defendants' motion,

dismissing only the plaintiff's claim for conversion because it was preempted by the Michigan Uniform Trade Secret Act (MUTSA). (Dkt. 138).

Shortly after the court ruled on the parties' motions for summary judgment, the parties stipulated to a trial before the bench, and later consented to the referral of the case to the undersigned for all proceedings, including the bench trial. (Dkt. 144, 164). The Court held a five day bench trial which was completed on December 22, 2016. The Court's ruling follows.

## III.  FACTUAL FINDINGS

Plaintiff American Furukawa, Inc. (alternately "AF" or "The Company") is the American subsidiary of the Japanese corporation Furukawa Electric Company ("FEC"). (Dkt. 184, Pg ID 4758). AF is the distributor of automotive and electrical components including power cables and wires. (Pl. Ex. 2; Dkt. 184, Pg ID 4762-64). The Company operates three divisions known as the Automotive Parts Division ("APD"), the Wire Harness Division ("WHD") and the Electronic Specialties Division ("ESD"). (Pl. Ex.1, Dkt. 184, Pg ID 4761-62). The dispute in this case involved the ESD division.

Huatong supplied power cables to AF's ESD division, which the Company, in turn sold to its U.S. customers. (Pl. Ex. 3; Dkt. 184, Pg ID 4785-86, 4788-89). Huatong supplied insulated wire products and overhead wire products under a Sales and Purchase Agreement with AF dated March 12, 2012. (Pl. Ex. 3). That

agreement expired on March 7, 2013, but was automatically renewed for successive one year periods unless either party notified the other at least three months before the expiration of the initial or any extended term. (*Id*.). Aside from its arrangement with plaintiff, Huatong did not otherwise have a sales or customer network for its products in the U.S. market. (Dkt. 184, Pg ID 4784-85).

During his employment with AF defendant Hossain worked variously as a Power Systems Electrical Engineer, Product Manager and Senior Product Manager until he resigned in April 2014. (Dkt. 184, Pg ID 4765, 4767-70). At the time he resigned, Hossain was a Senior Product Manager responsible for taking orders, building customer and supplier relationships, managing customer accounts, monitoring customer developments, coordinating with factories, processing customer orders and preparing customer quotes. (*Id*.). In performing his duties at AF, Hossain had access to the company's confidential information, including business plans, financial and pricing information [factory costs, shipping costs, margins, pricing formulas], marketing plans, customer targets, logistics [efficient and cost-effective methods for expediently and safely delivering the product from factory to customer], and manufacturing capacity. (Dkt. 184, Pg ID 4771-73, 4821-22; Dkt. 188, Pg ID 5791-93).

In February 2014, while traveling in China on AF business, Hossain met with a Huatong representative, without anyone else from AF, FEC or any of its

4

affiliates (e.g. Furukawa Electric Industrial Cable and Shenyang Furukawa) being present, in direct contravention of instructions from AF. (Pl. Ex. 12; Dkt. 186, Pg ID 5335-41). Hossain also attempted to meet with Huatong's general manager. (Pl. Ex. 11). Hossain was unsuccessful in arranging a face-to-face meeting with Huatong's general manager, but he did speak to him after he returned to the U.S. from China. (*Id.*; Dkt. 186, Pg ID 5342). The next month, in early March 2014, Hossain entered into employment negotiations with Huatong. (Pl. Ex. 14; Dkt. 184, Pg ID 4802). The parties completed negotiations and Hossain executed an employment agreement with Huatong on March 10, 2014. (Pl. Ex. 15). The agreement called for Hossain to begin employment with Huatong as the CEO of the soon to be formed U.S. affiliate of Huatong on March 17, 2014. (*Id.*). Hossain was to receive an annual salary of $156,000 and a signing bonus of $78,000. (*Id.*). Shortly thereafter, HT was established as a Michigan limited liability company with Huatong and Hossain as its members. (Pl. Ex. 24).

On the day he was scheduled to begin working as HT's CEO, Hossain reported to AF that he was unable to report to work because he had torn his Achilles tendon. (Pl. Ex. 14 - "Employment Agreement" and Pl. Ex. 17; Dkt. 186, Pg ID 5080-81). As a result, AF placed Hossain on a leave of absence, during which time he collected short-term disability benefits from AF's insurer. (Pl. Ex. 12; Dkt. 186, Pg ID 5082). In compliance with rules related to short-term

disability benefits, AF instructed Hossain not to perform any work during his leave of absence. (Pl. Ex. 18, 19; Dkt. 186, Pg ID 5082-85; Dkt. 188, Pg ID 5815). In spite of AF's instruction, Hossain accessed, copied and downloaded several e-mail messages from his AF (work) account to his personal e-mail address. (Pl. Ex. 20). The e-mail transfer included customer evaluation notes, prospective sales information and customer contact information. (Pl. Exs. 20, 21). While still employed by AF, Hossain also forwarded information regarding AF's logistics and sales leads to his Huatong contact in China. (Pl. Exs. 22, 25). Also while still employed by AF, Hossain accessed and copied a list of sales leads developed by plaintiff from a trade show. (Pl. Exs. 58, 71A). This list included information about people who had expressed an interest in buying from AF, including the degree to which the person(s) identified could influence their respective company's buying decisions. (Pl. Ex. 71A, Ln.16).

On March 20, 2014, Huatong notified plaintiff that it would stop supplying plaintiff with power cables, effective immediately. (Dkt. 184, Pg ID 4827; Dkt. 187, Pg ID 5366-67). This abrupt cessation had an immediate and direct impact on AF's sales because AF did not have an alternate supplier for many of the products Huatong was supplying. (Dkt. 184, Pg ID 4827-28, 4830-31; Dkt. 185, Pg ID 5050-52; Dkt. 187, Pg ID 5377-81). The products impacted by Huatong's

decision included those for a prospective customer, Kingwire[1], which had committed to buying three types of cable from AF, as well as those sold to existing customers of AF such as WTEC. (Dkt. 187, Pg ID 5377-82).

While on leave and collecting disability benefits, but still employed by AF, Hossain started performing his duties under his employment agreement with Huatong. The duties performed during this period included hiring a consultant to assist in entity formation, searching for office space, and forming a website for the entity that would become HT. (Pl. Ex. 24).

Also during his leave of absence, Hossain affirmed his plan to resume his duties with AF once he recovered from his injury, but asked to be relieved of his travel obligations. (Dkt. 186, Pg ID 5085-86). AF accommodated Hossain's request, replacing his travel obligations with other responsibilities and making no change to his title or salary. (Pl. Ex. 10). Hossain returned to active duty for AF on April 25, 2014 (Pl. Ex. 29; Dkt. 186, Pg ID 5088-92), but after working for several hours on Monday, April 28, he announced he was resigning effective that Friday, May 2, 2014. (Pl. Ex. 30, 31, Dkt. 186, Pg ID 5094-97). AF agreed to pay Hossain through May 2, 2014, but requested that he gather his belongings and leave the workplace on Tuesday, April 29th. (Pl. Exs. 32, 34; Dkt. 186, Pg ID

---

[1] By March 2014, plaintiff had spent nearly two years soliciting Kingwire's power cable business, during which it incurred sales costs of $150,000. (Dkt. 187, Pg ID 5371-75).

5097-5104). Hossain protested, claiming he needed more time. (*Id*.). At his exit interview, Hossain refused to sign an Employment Certification & Agreement on Termination certifying that he had returned all property belonging to AF and had complied with and would continue to abide by the Invention Assignment and Secrecy Agreement. (Pl. Ex. 37; Dkt. 186, Pg ID 5100). After the exit interview, Hossain returned to his desk, initially ignoring the instruction to pack his belongings and exit the building within thirty minutes, but ultimately packed and left later the afternoon of April 29th, following a tense confrontation with AF's management. (Pl. Ex. 34; Dkt. 186, Pg ID 5102-03).

Within weeks of Hossain's departure, AF learned from an errant e-mail that Hossain was using a pricing template and formulas, which it had developed, to solicit business from one of its customers, WTEC. (Pl. Exs. 42, 81; Dkt. 184, Pg ID 4835-36; Dkt. 187, Pg ID 5392-93). AF lost much of WTEC's business when Huatong stopped supplying the type of cable that plaintiff sold to WTEC. (Dkt. 188, Pg ID 5665-67). Hossain was soliciting WTEC to buy the same Huatong cable it had been buying from plaintiff from HT. (Pl. Ex. 42; Dkt. 184, Pg ID 4835-36; Dkt. 187, Pg ID 5392-93).

AF conducted a forensic investigation of the two laptop computers Hossain used during his employment with plaintiff. (Dkt. 184, Pg ID 4799, 4853-54; Dkt. 186, Pg ID 5182-83). The investigation revealed that Hossain had copied

information, including 27,000 emails and thousands of business-related attachments, to several external storage devices. (Dkt. 186, Pg ID 5186-87, 5201-10). This revelation prompted the filing of this suit as well as the requested TRO to which the parties later stipulated. (Dkt. 1-4, 18). The court-ordered inspection of plaintiff's personal computer and external storage devices further revealed that Hossain had not only copied these files, but had also organized the copied files into folders and subfolders according to their content. (Pl. Exs. 56, 57; Dkt. 187, Pg ID 5216-21, 5234, 5268-70). Moreover, the forensic examination showed that Hossain accessed plaintiff's information several times after he resigned from his employment with plaintiff. (Pl. Exs. 57, 58, Dkt. 186, Pg ID 5239-49, 5268-70). The forensic examination also revealed that "jump list files" had been deleted and removed from the computer. (Dkt. 186, Pg ID 5250-52). The forensic expert conducting the investigation testified that this finding was significant for two reasons: (1) because jump list files cannot be deleted inadvertently – deletion requires user intervention; and (2) because the deletion of such lists permits the transfer of files and information without detection. (*Id*.; Dkt. 186, Pg ID 5264-66, 5307-10). The forensic expert also testified that his investigation revealed that Hossain had transferred files to external devices that he did not produce. (Pl. Ex. 57; Dkt. 186, Pg ID 5256-63).

From the forensic investigation AF also learned that, in May 2014, after

resigning from the company, Hossain shared meeting minutes prepared by AF's vice president, Shuichi Takagi, in June 2013 with Huatong. (Pl. Ex. 43; Dkt. 187, Pg ID 5476-77; Dkt. 188, Pg ID 5631-32). The investigation also showed that in August 2014, just three days before preparing HT's business plan, Hossain accessed the 2014 ESD sales budget plan, the ESD actual profit and loss statement, balance sheet and cash flow statement for 2013, the ESD 5 year plan summary and the midrange plan summary. (Pl. Ex. 58; Dkt. 187, Pg ID 5477-78). The ESD budget plan included sales projections, salary information, expense details, costs of goods and cash flow information. (Pl. Ex. 71A, Ln. 9; Dkt. 187, Pg ID 5425-26). The HT business plan contains sales projections for Kingwire identical to those prepared for AF by Hossain's former colleague. (Pl. Ex. 47; Dkt. 187, Pg ID 5463, 5482-84). The HT business plan reflects a commitment from Kingwire to a monthly purchase of $500,000 of the same cables it had previously committed to purchase from AF. (Pl. Ex. 47; Dkt. 185, Pg ID 5054; Dkt. 187, Pg ID 5484). The HT business plan also indicates that HT had received purchase orders from WTEC totaling $2,000,000, less than four months after it started operating. (Pl. Ex. 47,135).

The forensic audit revealed that the information downloaded by Hossain included business plans and financial information, marketing information, pricing information, customer email, quotation materials and engineering materials. (Pl.

Ex. 72; Dkt. 187, Pg ID 5414-24).  Certain files also contained forwarder information, shipper quotation information, customer lead information, competitor price list information, customer contact information and pricing information.  (Pl. Ex. 71A, Ln. 11, 16, 21, 22, 24; Dkt. 187, Pg ID 5430-5447).

## IV.  ANALYSIS

### A.  <u>Liability</u>

#### 1.  Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030

To prevail on a claim under the CFAA, AF must prove that Hossain (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that he (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value.  As the Court has previously noted, the Sixth Circuit has found that investigations into an offense and the performance of a damage assessment constitute a "loss" as defined by the CFAA.  (Dkt. 138) (citing *Yoder & Frey Auctioneers*, *Inc. v. EquipmentFacts*, *LLC*, 774 F.3d 1065, 1074 (6th Cir. 2014)).  The Court denied plaintiff's motion for summary judgment on the CFAA claim only because plaintiff had not provided the Court with documents evidencing its forensic investigation expenses at that time, a

necessary element of a CFAA claim.[2]  (Dkt. 138).  At trial, in addition to

producing evidence sufficient to satisfy elements 1 through 4 above,  plaintiff

produced evidence of investigative costs or damage assessment of $23,059.20,

which was not challenged by defendants.  (Pl. Ex. 64).  Thus, defendants are liable

for the same.

## 2.    Misappropriation of Trade Secrets

To succeed on a claim for misappropriation of a trade secret under Michigan

law, a plaintiff must prove: 1) the existence of a trade secret; 2) its acquisition in

confidence; and 3) the defendant's unauthorized use of it.  *Nedschroef Detroit*

*Corp. v. Bemas Enterprises LLC*, 106 F.Supp.3d 874, 884-85 (E.D. Mich. 2015),

*aff'd*, 646 Fed. Appx. 418 (6th Cir. 2016).  The Michigan Uniform Trade Secrets

Act ("MUTSA") defines a "trade secret" as information, including a formula,

pattern, compilation, program, device, method, technique, or process, that both: (i)

Derives independent economic value, actual or potential, from not being generally

known to, and not being readily ascertainable by proper means by, other persons

who can obtain economic value from its disclosure or use; and (ii) Is the subject of

efforts that are reasonable under the circumstances to maintain its secrecy.  *Id.*

---

[2] Even if these elements were not established at summary judgment, AF produced persuasive evidence at trial that Hossain intentionally accessed a computer, without and in excess of authority, to obtain information resulting in a loss over $5,000.  (Dkt. 184, Pg ID 4800) (Pl. Exs. 18-21, 54, 56-58, 64, 91-92).

(citing Mich. Comp. Laws § 445.1902(d)). Under MUTSA, "misappropriation"

means one of the following:

> (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
>
> (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:
>
>> (A) Used improper means to acquire knowledge of the trade secret;
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.
>>
>> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id*. (citing Mich. Comp. Laws § 445.1902(b)). The statute defines the term

"improper means" to include "breach ... of a duty to maintain secrecy...." *Id*.

(citing Mich. Comp. Laws § 445.1902(a)).

A trade secret may consist of a compilation of information, even if it is

compiled from outside sources available to other persons. *Mike's Train House, Inc. v. Lionel LLC,* 472 F.3d 398, 411 (6th Cir. 2006) ("A trade secret can exist in a combination of...components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret"). Knowledge of vendors, vendor capabilities, and pricing can be a trade secret so long as the information is not readily attainable. *Giasson Aerospace Science*, *Inc. v. RCO Engineering*, *Inc.*, 680 F.Supp.2d 830, 843 (E.D. Mich. 2010).

The Court finds that much of the content of the files Hossain downloaded as he prepared to leave plaintiff and form HT is protectable trade secret under MUTSA. This includes AF's business plans, sales projections, financial information, cost information, market information, customer information, quotation materials, pricing information and engineering data. (Pl. Exs. 20, 21, 42, 43, 58, 71A, 72, 81; Dkt. 184, Pg ID 4835-36; Dkt. 187, Pg ID 5392-93, 5414-5463, 5476-78). The Court finds ample evidence of Hossain's disclosure of these trade secrets and defendants' joint use of them. (Pl. Exs. 22, 39, 43, 47, 58, 71A; Dkt. 184, Pg ID 4825-27; Dkt. 187, Pg ID 5474-78, 5481-83). The Court is persuaded that defendants' unauthorized use of plaintiff's trade secrets damaged plaintiff. (Pl. Exs. 66, 67, 95).

3. Remaining Tort Claims

MUTSA provides a statutory action and remedies for misappropriation of trade secrets. *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 945-46 (W.D. Mich. 2003); Mich. Comp. Laws §§ 445.1903, 1904. The statute also displaces conflicting tort remedies for misappropriation of a trade secret. *Id.* (citing *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich.App. 125, 132 (2002)). However, MUTSA does not displace contractual remedies, "[o]ther civil remedies that are not based upon misappropriation of a trade secret," or "[c]riminal remedies, whether or not based upon misappropriation of a trade secret." *Id.* (citing Mich. Comp. Laws § 445.1908(2)).

a. Fraud

To prevail on a claim for fraud, a plaintiff must demonstrate that (1) the defendant made a material misrepresentation; (2) the representation was false; (3) when the representation was made the defendant knew it was false or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intent that plaintiff would act on it; (5) the plaintiff acted in reliance on it; and (6) the plaintiff suffered damages or injury. *M&D*, *Inc. v. W.M. McConkey*, 231 Mich. App. 22, 27 (1998).

The Court's ruling on Plaintiff's Motion for Summary Judgment (Dkt. 138, Pg ID 3522-3523) identified three potential affirmative misrepresentations by

Hossain: That he misrepresented his relationship with Huatong, and his activities on behalf of Huatong when he told AF (1) he was unable to work due to a basketball injury in March 2014; (2) he did not have another job lined up; and (3) he had returned all of AF's property and fully complied with the Secrecy Agreement. The court ruled that plaintiff could not have relied on the last two representations (that Hossain did not have another job, and that he had returned all of plaintiff's property and complied with the Secrecy Agreement) in continuing employment, salary and benefits and allowing him to have access to confidential information and customers because those representations were made after Hossain resigned from plaintiff's employment. (Dkt. 138, Pg ID 3523).

At trial AF asserted that it also relied on these misrepresentations in failing to take additional steps to protect itself, but the Court finds that Hossain's refusal to sign the Employee Certification & Agreement on Termination precluded any reliance on a representation that he had returned all property and would continue to comply with the Secrecy Agreement. (Pl. Ex. 37; Dkt. 186, Pg ID 5100). Additionally, according to evidence adduced at trial, plaintiff learned that Hossain was working for competitor Huatong approximately three weeks after he resigned. (Pl. Ex. 42, 81; Dkt. 184, Pg ID 4835-36; Dkt. 187, Pg ID 5392-93). Plaintiff offers no evidence of loss or damage derived specifically from this three week period. Accordingly, plaintiff has not demonstrated that it suffered any damage as

16

a result of plaintiff's misrepresentation regarding his employment.

Another alleged affirmative misrepresentation relates to Hossain's claim that he could not report to work for plaintiff in mid March-due to an ankle injury. The Court finds that plaintiff did not meet its burden of proof that this representation by Hossain was, indeed, false. (Dkt. 188, Pg ID 5765; Def. Ex. M).

Finally, plaintiff introduced evidence at trial that during his leave of absence in March 2014, Hossain represented to plaintiff that he intended to return to work when he recovered from his injury. (Dkt. 186, Pg ID 5085-5087). Based on the employment agreement Hossain entered into with Huatong (Pl. Ex. 15), and Hossain's actions during his leave of absence, this representation was clearly false. Plaintiff relied on this representation in continuing to employ Hossain and suffered damages in the amount of wages and benefits it continued to pay Hossain after this misrepresentation.

Plaintiff also asserts that it is entitled to recover damages for silent fraud, specifically Hossain's failure to disclose his entry into an employment agreement with Huatong, his downloading of plaintiff's information to his personal email account, computer and computer storage devices and his endeavors toward starting a competing business while still employed with plaintiff.

Although plaintiff correctly points out that a duty to disclose may arise from a fiduciary relationship, an employee is specifically permitted to take steps to

establish a competing business while still employed without breaching his duty of loyalty. *In re RnD Engr., LLC*, 546 B.R. 738, 771 (Bankr. E.D. Mich. 2016) (citing *Nedschroef Detroit Corp.*, 106 F.Supp.3d at 883). If the fiduciary relationship between employer and employee does not preclude actions by an employee to form a competing business, it follows that it also could not establish a legal or equitable duty for the employee to disclose those same actions to the employer. *See Hord v. Envtl. Research Inst. of Michigan*, 463 Mich. 399 (2000) ("Turning to the question of silent fraud, we agree... that mere nondisclosure is insufficient. There must be circumstances that establish a legal duty to make a disclosure."); *Barclae v. Zarb*, 300 Mich. App. 455 (2013) ("Silent fraud...is based on a defendant suppressing a material fact that he or she was legally obligated to disclose.... Such a duty may arise by law or by equity[.]"); *see also* 37 *Am. Jur. 2d*, Fraud and Deceit § 201(it is not every relationship to which the term "fiduciary" or "confidential" might conceivably be applied with some degree of reasonableness or plausibility that will authorize, by its existence alone, a presumption of fraud by concealment). Any silent fraud claim predicated on Hossain's downloading plaintiff's information is pre-empted under MUTSA. *See Bliss Clearing Niagra*, 270 F.Supp.2d at 946. Hence, plaintiff has not established a right to any remedy for silent fraud.

    b.  Breach of Fiduciary Duty

In general, employees owe a duty of loyalty to their employers. *Nedschroef Detroit Corp.*, 106 F.Supp.3d at 883. "'Although the parameters of this duty are not well-defined, some general rules exist. For example, an employee may take steps to establish a competing business while still employed without breaching the duty of loyalty, but the employee may not actually commence competition.'" *In re RnD Engr., LLC*, 546 B.R. at 771 (quoting *Nedschroef Detroit Corp.*, 106 F.Supp.3d at 883). An employee's plans and preparations "to engage in a competing business during the scope of their agency relationship with the plaintiff ... do not by themselves state a claim for a breach of the duty of loyalty." *Id*. (quoting *Mike Vaughn Custom Sports*, *Inc. v. Piku*, 15 F.Supp.3d 735, 752 (E.D. Mich. 2014).

Plaintiff's claim that Hossain violated his duty of loyalty by entering into the employment agreement with Huatong (to start a competing U.S. Huatong affiliate) is not viable. Nevertheless, this Court is persuaded by evidence at trial that Hossain went beyond the planning and preparation stages while he was still employed by plaintiff. For example, Hossain shared the contact information for AF's U.S. "forwarder" with Huatong, identified AF's current and prospective customers as potential Huatong customers and provided this information to Huatong while still employed by AF. (Pl. Ex. 22) (Dkt. Pg ID 4825-4827). This conduct violated Hossain's duty of loyalty to plaintiff, and may be remedied by the

forfeiture of the compensation plaintiff paid to or for the benefit of Hossain from March to May 2014. *See Nedschroef Detroit Corp.*, 106 F.Supp.3d at 890.

c.    Tortious Interference

The elements of a claim for tortious interference with a contract are: (1) the existence of a contract; (2) a breach of the contract; and (3) an unjustified instigation of the breach by the defendant. *Badiee v. Brighton Area Schools*, 265 Mich. App. 343, 366-67 (2005). An at-will contract can be improperly interfered with, but the contract's at-will nature makes the matter more analogous to interference with a business expectancy. *Health Call of Detroit v. Atrium Home & Health Care Serv. Inc.*, 268 Mich App. 83, 92 (2005).

The elements of tortious interference with a business expectancy are: "'the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional improper interference by the defendant inducing or causing a termination of the relationship or expectancy, and resultant damage to the plaintiff.'" *Nedschroef Detroit Corp.*, 106 F.Supp.3d at 889 (quoting *Cedroni Associates, Inc. v. Tomblinson, Harburn Assoc., Architects & Planners, Inc.*, 492 Mich. 40 (2012)).

Proof that the interference was "improper" can be shown by proving either (1) the intentional doing of an act wrongful *per se*, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading the

plaintiff's contractual rights or business relationship. *Id.* (citing *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich. App. 365 (2003)). Acts of concealment are indicia of "improper motive." *RnD Engineering, LLC*, 546 B.R. at 769.

Courts consider the likelihood or probability that the expectant relationship would have developed as desired absent tortious interference with the expectancy. *Cedroni Assoc. v. Tomblinson Harburn Assoc.*, 290 Mich. App. 577, 590 (2010), *rev'd on other grounds*, 492 Mich. 40 (2012). Optimism or mere hope is not enough to find a valid business expectancy, but plaintiff is not required to prove that the expectancy equated to a certainty or guarantee. *Id.*

The Court finds that plaintiff's sale and purchase agreement with Huatong was a valid contract, which was not terminable before March 7, 2015.[3] Huatong's decision to halt supply of power cables it supplied under the agreement on or about March 20, 2014 amounted to a breach of the sales and purchase agreement. The Court is persuaded that Hossain's conduct in February and March 2014, culminating in the formation of and his employment with HT induced Huatong's breach of its agreement with plaintiff. But for the activities of Hossain and HT, plaintiff would have continued to be Huatong's exclusive dealer in the United

---

[3] Plaintiff's 2012 sales and purchase agreement with Huatong could be cancelled each anniversary (March 7th) provided the cancelling party gave the other party three months notice. (Pl. Ex. 3).

States until at least March 2015. The disruption of the contract with Huatong resulted in AF's inability to supply its existing customer, WTEC and its well-cultivated prospective customer, Kingwire. (Dkt. 187, Pg ID 5377-82; Dkt. 188, Pg ID 5665-67).

Additionally, Hossain's misappropriation of plaintiff's confidential information, combined with HT's beneficial use of that information amounts to an improper interference with plaintiff's business relationships with WTEC and Kingwire. WTEC immediately began purchasing the Huatong cable it had been buying from AF, from HT. (Pl. Ex. 67, 95; Dkt. 188, Pg ID 5665-67). Based on these findings, AF is entitled to lost profit damages from defendants' WTEC sales.

The Court finds that AF's impending purchase order from Kingwire was a valid business expectancy and defendants' interference with that expectancy constitutes tortious interference warranting remedy. Nevertheless, measuring AF's damages from the loss of the Kingwire sales is more difficult because HT did not consummate a sale to Kingwire until after March 2015, when AF may well have lost Huatong as a supplier legitimately. (Pl. Ex. 67, 95). Profit on the $3 million of sales that AF projected (and HT directly adopted) for 2014 is too speculative to award as damages. (Pl. Ex. 47; Dkt. 185, Pg ID 5054; Dkt. 187, Pg ID 5463, 5482-84). Notwithstanding the speculative nature of the profits on the $3 million in sales, AF was damaged and defendants were unjustly enriched by the

unrecovered sales costs of AF's dedicated solicitation of Kingwire. Thus, those costs are an appropriate remedy for plaintiff here.

        d.     Civil Conspiracy

Proof of a civil conspiracy in violation of Michigan law requires proof of (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means. *Nedschroef Detroit Corp.*, 106 F.Supp.3d at 890 (citing *Petroleum Enhancer, LLC v. Woodward*, 558 Fed. Appx. 569, 580 (6th Cir. 2014)). "Under Michigan law, 'a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate actionable tort.'" *Id.* (quoting *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*, 157 Mich. App. 618 (1986)). Hossain and HT clearly worked together, and, as established earlier, breach of fiduciary duty, misappropriation of trade secrets and tortious interference with a business expectancy supply the underlying predicate necessary to find a civil conspiracy existed.

        e.     Conversion

The Court previously dismissed AF's conversion claim finding it was pre-empted by MUTSA because AF acknowledged that all information taken constituted trade secrets. (Dkt. 138, 160).[4] Thus, this claim is not considered.

---

[4] Under the doctrine of the law of the case, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618 (1983). "Accordingly, the doctrine 'does not apply if

4. Breach of Contract

This Court previously ruled that the Secrecy Agreement was a binding document and that Hossain's conduct was in direct violation of the terms of that agreement. The Court withheld awarding AF summary judgment only for absence of proof that it was damaged by Hossain's violation. (Dkt. 138). As discussed in other sections of these Findings of Fact and Conclusions of Law, plaintiff has established damages in the form of lost profits from sales lost to HT as well as unrecovered sales costs for Kingwire, from which HT reaped the benefits. Accordingly, the Court finds that Hossain breached the Secrecy Agreement with plaintiff.

B. <u>Damages</u>

This Court awards plaintiff **$360,809.50** from the defendants in lost profit damages. This amount represents HT's gross profits for 2014 and the first quarter of 2015. (Pl. Ex. 95). Plaintiff's 2012 Sales and Purchase agreement with

---

the court is "convinced that [its prior decision] is clearly erroneous and would work a manifest injustice."'" *Pepper v. United States*, 562 U.S. 476, 506–07 (2011) (quoting *Agostini v. Felton*, 521 U.S. 203, 236 (1997)). Application of the doctrine is discretionary, and courts should be reluctant, absent good cause, to revisit prior rulings. *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 131 (2d Cir. 1997), *cert denied* 522 U.S. 948 (1997) (citation omitted). In the view of the undersigned, it is appropriate to invoke the doctrine in this matter. Further, there is a split of authority on whether a magistrate judge, even on consent of the parties, has the authority to reconsider a prior ruling of the district judge in the same case. *Compare Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564–65 (2d Cir. 1998) *and Taylor v. Nat'l Group of Companies, Inc.*, 765 F. Supp. 411 (N.D. Oh. 1990) *with Copper v. Brookshire*, 70 F.3d 377 (5th Cir. 1995) *and Fieldwork Boston, Inc. v. United States*, 344 F. Supp. 2d 257 (D. Mass. 2004).

Huatong could be cancelled each anniversary (March 7th) with three months notice.  (Pl. Ex. 3).   Defendant Hossain was an at-will employee without a non-compete agreement.  (Dkt. 186, Pg ID 5149).  Thus, even without any malfeasance by defendants, AF may have lost its supplier of the cables that it sold to WTEC and planned to sell to Kingwire in March 2015.  Accordingly, this Court finds that lost profits after March 2015 are too speculative to be awarded as damages.  *See In re Jonatzke*, 478 B.R. 846, 865 (Bankr. E.D. Mich. 2012).

The Court also awards AF unjust enrichment damages of **$150,000.00** from defendants to compensate for its unrecovered sales costs in soliciting Kingwire as a customer.  This amount encompasses human resource and travel costs incurred by AF in the approximately two years it spent soliciting sales from Kingwire.  (Dkt. 187, Pg ID 5371-5375).  In March 2014, Kingwire was poised to issue a purchase order to AF when Huatong ceased supplying AF with the power cable offered to Kingwire.  (*Id.*).  Kingwire committed to purchasing from HT the same product it had committed to purchasing from plaintiff.  (Dkt. 187, Pg ID 5484).  Although HT did not consummate a sale to Kingwire before March 2015, the Court is persuaded that Hossein's appropriation and use of AF's confidential trade secrets enabled HT to unjustly reap the benefits of plaintiff's extensive sales efforts in securing the Kingwire business.

The Court awards plaintiff **$17,221.00** from Hossain as reimbursement for

salary and compensation plaintiff paid to him while he was both employed by and competing with AF, from March to May 2014.  (Pl. Ex. 66).

Finally, the Court awards plaintiff **$23,059.20** from Hossain pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. §1030, for loss in the form of the cost of the forensic investigation relative to his unauthorized conduct in accessing and copying AF's computer records.

Plaintiff must file a brief within 28 days of the entry of judgment in this matter in which they present proof of their reasonable attorney's fees and costs incurred in this action, as permitted under CFAA.  The Court reserves jurisdiction to adjudicate any such claim for reasonable attorney's fees in post-judgment proceedings.

**IT IS SO ORDERED**.

Date: September 29, 2017       s/Stephanie Dawkins Davis
                               Stephanie Dawkins Davis
                               United States Magistrate Judge

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on September 29, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                               s/Tammy Hallwood
                               Case Manager
                               (810) 341-7887
                               tammy_hallwood@mied.uscourts.gov